**Ron BROWN & Ron Brown Associates, Appellants,**

v.

**UNAUTHORIZED PRACTICE OF LAW COMMITTEE, State Bar of Texas, Appellees.**

No. 05–87–00223–CV.

Court of Appeals of Texas, Dallas.

Sept. 22, 1987.

Rehearing Denied Oct. 26, 1987.

Ron Brown, Dallas, pro se.

Bertran T. Bader, III, Dallas, for appellees.

Before DEVANY, STEWART and ROWE, JJ.

STEWART, Justice.

The Unauthorized Practice of Law Committee of the State Bar of Texas (the Committee) sued Ron Brown and Ron Brown and Associates (referred to collectively in the singular as "Brown"); the Committee sought a declaration that certain acts and practices engaged in by Brown constituted the practice of law; the Committee also sought injunctive relief. Tried before the court, the judgment: (1) listed six activities in which the court found Brown to have engaged, (2) declared that these six activities constitute the practice of law, and (3) granted the Committee permanent injunctive relief. Brown brings eight points of error. We affirm.

### FACTS

Perry C. Post III testified that he was the chairman of the Dallas Subcommittee of the Unauthorized Practice of Law Committee of the State Bar of Texas. He stated that the subcommittee received four or five complaints with regard to Brown and that the subcommittee authorized Claudia Slate to investigate the allegations against Brown. At a hearing, Brown told the subcommittee that he started his agent business in July or September of 1985 and that he was representing twelve to fifteen persons at that time. The subcommittee recommended to the full committee to file suit against Brown to enjoin his activities. The state committee authorized the suit.

At trial, Brown admitted that he was not an attorney; however, he stated that he did

have legal training. He explained that he went to the Brownwood Institute for paralegal study for one year. He also stated that he worked for various attorneys on a free-lance basis. Brown testified that he had been in this business for about one year.

The record reflects the following undisputed facts. Ron Brown conducted a business in which he entered contracts with individuals to represent them in resolving their personal injury and/or property damage claims on a contingent fee basis. Prior to April 1986, Brown used a form contract that provided that Brown, as agent, was authorized to effect a settlement or compromise of the client's claim, subject to client approval, or to assist the client in retaining legal counsel. The contract further provided that if legal counsel was not obtained, Brown would get one-third of the amount paid to settle his client's claim, but he would receive forty percent of any amount received after obtaining counsel to file suit and he would pay the attorney's fee from his portion. Brown also reserved the right to select legal counsel.

In April 1986, after the investigational hearing on March 25, 1986, Brown modified the contract form he was using to reflect that Brown, as agent, "was authorized to present factual data and general background information regarding the incident [from which the client's claim arose] and to effect a tentative settlement or compromise, subject to CLIENT approval." The modified contract retained the provision that neither the agent nor the client could finalize a settlement without the other's approval but added, "and only after CLIENT has conferred with an attorney to advise such CLIENT of the nature and binding effect CLIENT(S) [sic] acceptance of said tentative agreement has within the judicial system." It further provided that the agent has specifically held out to the client that he is not an attorney and "is not to in any way engage in the practice of law in the performance of said duties." This form deleted the provision for Brown to select legal counsel and for an increased percentage of the recovery if an attorney was obtained; instead, this form provided for a twenty percent contingent fee of any amount received by compromise or settlement and, if any attorney became necessary, agent (Brown) would receive $45 per hour for a maximum of forty hours.

In identical affidavits of three of his clients, which are attached to Brown's pleadings,[1] the clients state:

I hired Ron Brown, of RON BROWN & ASSOCIATES, to act as my agent/representative in assisting me in presenting, processing and resolving all claim(s) arising out of said accident.

Mr. Brown informed me that the type of services he would provide in my behalf would be as follows:

a) assist me with completing blank claim form(s) provided by insurance companies;

b) make telephone and/or personal appearances along with or in my behalf in said claim(s) as my spokesperson;

c) assist me in obtaining medical reports and bills from my physician(s);

d) assist me in ascertaining my losses;

e) submit letter(s) to insurance companies notifying them of (1) general background information relative to what, when, where and how the accident/incident occurred as I related same to him, (2) names and addresses of my treating physician(s), (3) names and addresses of my employer(s), and, if need be, (4) he would submit all proposed offers of settlement at my request.

Mr. Brown never represented himself to me as an attorney; never advised me of any legal rights, privileges or duties under the law; nor did he advise me whether to pursue any claims(s). Mr. Brown always told me that I could seek the services of an attorney of my own choosing or that he would recommend an attorney, if requested by me, at any time.

---

1. The parties stipulated that the trial court could take judicial notice of "all papers on file in this cause," and the judgment so reflects.

Further, Mr. Brown informed me that his services would cease one (1) year from the date of my accident, and, if my claim(s) were not resolved within that period, he would urge that I seek the services of an attorney.

Mr. Brown never advised me to accept or reject any offered sums of money in settlement of my claim(s), he merely presented all offers that were advanced and left that decision completely with me whether to accept or reject same.

The record also reflects the testimony of two insurance adjusters with whom Brown dealt on behalf of clients. Ruth Hunter, a claims representative for Members Mutual Insurance Company, testified that she received maybe half a dozen letters of representation from Brown, saying he was representing someone with respect to an automobile accident. The persons represented by Brown were either the insured under a Members policy or were involved in an accident with an insured of Members and making a claim against Members' insured. Hunter stated that normally Brown would send a specialist packet for his client, that her job was to evaluate the claim and get back to Brown regarding settlement of the claim; that there were occasions when she had made an offer, he made a counteroffer and there was dialogue back and forth to reach an agreeable number; that this discussion could be called negotiation of the claims; that she actually settled claims with individuals Brown was representing; that "Ron Brown, Attorney at Law," was a co-payee on the insurance draft on every occasion in which a settlement was reached; that she believed Brown was an Attorney "because he conducted himself the way other attorneys did. He sent the letter of representation. He sent his expenses. He called me periodically." Hunter also testified that Brown had never told her he was an attorney; that she assumed it; that she did not know whether Brown endorsed the insurance drafts as "agent/representative" instead of as "attorney at law;" and that in her ten years as an adjuster, Brown was the first agent who had ever presented her a claim to handle, all other accident claims having been from attorneys.

Van Simms, a liability claims supervisor with Fireman's Insurance Company, testified that when he was a claims representative he received a letter of representation from Brown concerning an automobile accident involving Joanne Bryant, one of Fireman's insureds. Brown was representing Eunice King and Norma King regarding a personal injury to Eunice's neck and shoulders and regarding property damage. In response to Brown's letter, Simms called Brown and told him that the company had already accepted liability on the case and that "we had accepted the claim." Later Brown wrote Simms a second letter indicating that his client was still receiving the care of a physician and that "I would be amendable [sic] to a resolution of this matter on an estimated basis." Simms testified that he interpreted the letter to mean that Brown possibly would settle the case at that time. He stated, however, that the company would not settle a case until all medical bills were received and reviewed. He further stated that when he received the second letter, he noted that Brown was not an attorney; that he failed to pick that up on Brown's first letter because it came in just like any other letter from an attorney's office, the letterhead looked like any other attorney's letterhead, and he failed to notice it did not say attorney on it. Simms then contacted his claims manager about how to proceed and subsequently wrote Brown that he could not negotiate the claim with Brown because he was not an attorney. Simms also acknowledged that Brown never represented himself to Simms as an attorney; that he presumed Brown was an attorney; that the facts of the accident, what happened, and basic background information about the incident that Brown presented in his first letter were essentially the same as the information provided by the company's insured; and that the issue of liability was never in dispute between them. Simms further testified that he and Brown never negotiated regarding settlement of the claim and no offers were made by either of them.

Simms also testified that an adjuster is licensed by the State; that to get a license one must take a training course and pass a test; and that the license allows an adjuster to adjust claims and make settlements concerning monetary value on behalf of his employer; that if a legal question arises he can consult both house counsel and outside counsel employed by the company; and that no legal question arose in his dealings with Brown requiring assistance of an attorney.

Only one of Brown's clients, Gloria Nicely, testified at trial. Her testimony reveals that she was a passenger in a car involved in an accident; that she was injured in the accident; that the driver, Brown's brother-in-law, told her Brown was an attorney and recommended Brown to her; she went to his office "looking to hire an attorney" and thought she hired one because Brown did not tell her he was not an attorney. She told Brown what had happened and he said he could handle the claim and would contact the insurance agent and the lady in the other car involved in the accident; that she filled out a contract with Brown in which he was to get one-third of what she got.

## ARGUMENTS

In Brown's eighth point of error, he contends that the trial court erred as a matter of law in denying his request for findings of fact and conclusions of law. Because the trial court incorporated its findings of fact and conclusions of law within the judgment, this point of error is moot. In a nonjury trial, the findings and conclusions are normally placed in a separate instrument filed after a formal request by a party; however, when the trial court incorporates findings and conclusions into the judgment—even when no party requested them—they shall be treated as findings and conclusions filed in accordance with rule 296 of the Texas Rules of Civil Procedure. *Humble Exploration Co. v. Fairway Land Co.*, 641 S.W.2d 934 (Tex.App.—Dallas 1982, writ ref'd n.r.e.)

In Brown's first six points of error, he attacks (1) the trial court's declaration that the six listed activities constitute the prac-

tice of law, (2) the trial court's finding that he engaged in three of those activities, and (3) the trial court's granting a permanent injunction against him. The trial court found that Brown engaged in the following activities:

(a) contracting with persons to represent them with regard to their personal causes of action for property damages and/or personal injury;

(b) advising persons as to their rights and the advisability of making claims for personal injuries and/or property damages;

(c) advising persons as to whether to accept an offered sum of money in settlement of claims for personal injuries and/or property damages;

(d) entering into contracts with individuals to represent them in their personal injury and/or property damage matters on a contingent fee together with an attempted assignment of a portion of the person's cause of action to the defendant;

(e) entering into contracts with third persons which purport to grant to the defendant the exclusive right to select and retain legal counsel to represent the individual in any legal proceeding; and

(f) advising "clients" of their rights, duties, and privileges under the laws.

Brown does not attack the trial court's findings that he engaged in the activities described in (a), (d), and (e) above, all of which describe the nature of the contracts he entered into with individuals regarding their claims for personal injury and/or property damage arising from automobile accidents. However, in his second, third, and fourth points, Brown contends that the trial court erred in finding that he engaged in the activities described in (b), (c), and (f) above because there is no evidence or insufficient evidence to support those findings.

When determining a no-evidence point of error, appellate courts must consider only the evidence and inferences that support the fact findings and disregard all evidence and inferences to the contrary. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206 (Tex.1985). When addressing

insufficient evidence points, appellate courts consider all of the evidence in order to determine whether the evidence supporting the finding is so weak, or the evidence to the contrary so overwhelming, that the finding should be set aside and a new trial ordered. *Anderson v. Havins*, 595 S.W.2d 147, 156 (Tex.Civ.App.—Amarillo 1980, writ dism'd w.o.j.).

■ Brown correctly argues that the record nowhere reveals any evidence of one of his clients directly testifying, "Ron Brown advised me of my rights and of the advisability of making a claim," or "Ron Brown advised me as to whether to accept an offered sum of money in settlement of my claim," or "Ron Brown advised me of my rights, duties, and privileges under the laws." Because there is no direct testimony on those three fact findings, Brown maintains that there is no evidence to support them. For the reasons given below, we disagree with Brown's contention.

■ A person may confer legal advice not only by word of mouth but also by a course of conduct that encourages litigation and the prosecution of claims. *Quarles v. State Bar of Texas*, 316 S.W.2d 797, 800, 802, & 804 (Tex.Civ.App.—Houston 1958), *pet. denied for writ of cert. to Supreme Court of Texas*, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). We agree with Brown that there is no evidence that he ever verbally told his clients their rights. This may be due to the fact that Brown, not being an attorney, did not know himself what his client's legal rights were. Brown's course of conduct nevertheless encouraged litigation and the prosecution of claims and, at least implicitly, advised his clients of what he perceived to be their legal rights. Determining the legal liability, the extent of legally compensable damages, and the legal rights and privileges of personal injury and property damage claimants, by their very nature, require legal skill and knowledge. We now illustrate how Brown's course of conduct provides both legally and factually sufficient evidence to support the trial court's findings of fact.

We first address whether Brown advised persons as to their rights and the advisability of making claims for personal injuries and/or property damages (finding (b)). Brown contends that he merely handled undisputed and uncontested claims and that he never advised clients of their rights or the advisability of making claims because, "When they come to me, they already feel they have a case. When they come to me, they're usually already involved in an accident, and they know whose [sic] at fault."

Plaintiff's exhibits one, two, five, and ten illustrate that Brown represented Gloria Nicely, Eunice and Norma King, Ellen White, and Zenobia Sanders, respectively. These persons apparently "felt" they had a claim, and the fact that Brown undertook to represent them regarding their claims illustrates that he impliedly advised them that they did indeed have legal rights and that they certainly should make a claim.

Brown emphasizes that he handles only undisputed and uncontested claims. On the issue of liability, this may be so. However, the evidence abundantly shows that Brown negotiated settlements on damages. Ruth Hunter, a claims representative for Members Insurance, testified that she negotiated with Brown on perhaps six different claims. Van Simms, a claims supervisor with Fireman's Insurance, testified that Brown wanted to settle Eunice King's damages on an estimated basis, which meant calculating future medical expenses. It is self-evident that if damages are undisputed and uncontested, then negotiation would not be necessary; because the evidence shows that Brown negotiated, at least on damage issues, we cannot agree that Brown handled only undisputed and uncontested cases.

Brown denied negotiating; he contends that he merely processed claims and that his clients determined their own damages and that he merely inserted their figure and thereafter acted as a go-between. However, Brown admitted on the stand that he instituted a suit against three insurance companies precisely because they refused to negotiate with him. Furthermore,

Brown's sworn petition in that case states that he acts "as their agent in ascertaining damages...."

Finally, Gloria Nicely testified that when she contracted with Brown, she thought that she had hired an attorney. If Brown did in fact merely act as a go-between, and if he merely asked for the damages his clients asked for, then Brown again was impliedly advising his clients that the damages for which they asked were in fact the only damages to which they were entitled. From the above evidence, we hold that the evidence is both legally and factually sufficient to support the finding that Brown advised persons as to their rights and the advisability of making claims for personal injuries and/or property claims.

We now address whether Brown advised persons as to whether to accept an offered sum of money in settlement of claims for personal injuries and/or property damages (finding (c)). Brown's contract with White provides that neither he nor she may settle her claim without the other's approval in writing. When Brown approves a settlement he again impliedly advises his client to accept the sum of money offered in settlement. We hold that this evidence is both legally and factually sufficient to support this finding.

The last fact finding we must address is whether Brown advised his clients of their rights, duties, and privileges under the law (finding (f)). The evidence necessary to support this finding is identical to the evidence necessary to support findings (b) and (c). Because we have held the evidence in support of those findings legally and factually sufficient, we also hold the evidence legally and factually sufficient to support this finding. We overrule points two, three, and four, attacking the trial court's findings that he engaged in the acts under paragraphs (b), (c), and (f).

In points two, three, and four, Brown also attacks the trial court's conclusions that the activities described in sections (b), (c), and (f) constitute the practice of law. In points one, five, and six, he attacks the trial court's conclusions that the activities described in (a), (d), and (e) constitute the practice of law. For the reasons given below, we hold that all six sections of the judgment describe activities that constitute the practice of law.

■ The Legislature has defined the practice of law as follows:

[T]he practice of law embraces ... the management of the actions ... on behalf of clients before judges in courts as well as services rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined. This definition is not exclusive and does not deprive the judicial branch of the power and authority both under this Act and the adjudicated cases to determine whether other services and acts not enumerated in this Act may constitute the practice of law.

TEX.REV.CIV.STAT.ANN. art. 320a–1, § 19(a) (Vernon Supp.1987). Courts inherently have the power to determine what is the practice of law on a case by case basis, unrestrained by the statutory definition. *Unauthorized Practice Committee, State Bar of Texas v. Cortez*, 692 S.W.2d 47, 50 (Tex.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985).

■ The practice of law embraces in general all advice to clients and all *action* taken for them in matters connected with the law. *Quarles*, 316 S.W.2d at 803. When a person acts for himself or others and undertakes to advise prospective employers or clients by word *or course of conduct* concerning their legal rights and the prospects of settling personal injury, accident, or other legal claims, thereby encouraging the assertion or prosecution of claims or lawsuits, this person steps beyond the bounds of a legitimate investigation of the facts and engages in the unauthorized practice of law. *Id.* at 800, 802–03.

■ The controlling purpose of all laws, rules, and decisions forbidding unlicensed persons to practice law is to protect

the public against persons inexperienced and unlearned in legal matters from attempting to perform legal services. *Grievance Committee State Bar of Texas, Twenty–First Congressional District v. Coryell,* 190 S.W.2d 130, 131 (Tex.Civ.App. —Austin 1945, writ ref'd w.o.m.). The objective is to protect the public against injury from acts or services, professional in nature, deemed by both the legislature and the courts to be the practice of law, done or performed by those not deemed by law to be qualified to perform them. *Grievance Committee of State Bar of Texas, Twenty–First Congressional District v. Dean,* 190 S.W.2d 126, 129 (Tex.Civ.App.—Austin 1945, no writ). The character of the service and its relation to the public interest determines whether services performed by a layman constitute the practice of law. *Id.*

◼ Contracting with persons to represent them with regard to their personal causes of action for property damages and/or personal injury constitutes the practice of law. *Quarles,* 316 S.W.2d at 801 & 804; *cf. Davies v. Unauthorized Practice Committee of State Bar of Texas,* 431 S.W.2d 590, 594 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.) (acting in representative capacity in the presentation of claims). Advising persons as to their rights and the advisability of making claims for personal injuries and/or property damages constitutes the practice of law. *See Quarles,* 316 S.W.2d at 800 & 804. Advising persons as to whether to accept an offered sum of money in settlement of claims for personal injuries and/or property damages entails the practice of law. *Cf. Stewart Abstract Co. v. Judicial Commission,* 131 S.W.2d 686, 689 (Tex.Civ.App.—Beaumont 1939, no writ) (all advice to clients connected with the law). Entering into contracts with persons to represent them in their personal injury and/or property damage matters on a contingent fee together with an attempted assignment of a portion of the person's cause of action involves the practice of law. *Quarles,* 316 S.W.2d at 800–01 & 803. Entering into contracts with third persons which purport to grant the exclusive right to select and retain legal counsel to represent the individual in any legal proceeding constitutes the practice of law. *Cf. id.* at 804 (peddling and offering to attorneys legal business of claimants). Advising "clients" of their rights, duties, and privileges under the laws entails the practice of law. *Id.* at 802.

◼ Brown argues that the Texas Insurance Code authorizes persons such as himself to handle undisputed and uncontested claims and claims arising under life, accident, and health insurance policies, provided the person merely performs clerical duties and does not negotiate with the other parties on the disputed and contested claims. TEX.INS.CODE ANN. art. 21.07–4, § 1(b)(5) & (6) (Vernon Supp.1987).

◼ We conclude that Brown's reliance on this statute is misplaced for the following reasons. First, Brown has not been enjoined from performing clerical duties and there is no contention that purely clerical duties, such as recording a client's responses to questions on a form, is the unauthorized practice of law. Second, we disagree with Brown that the evidence shows that he only handled undisputed and uncontested claims. Brown apparently believes that if the *issue* of liability is uncontested, that the *claim* is undisputed and uncontested. A claim or cause of action for personal injury and/or property damage also involves the issue of damages, and as long as the damage issue is unresolved, the claim is a disputed and contested claim. There is ample proof in this record that Brown negotiated the amount of damages to be paid on behalf of parties other than himself. This activity required the use of legal skill and knowledge and, thus, constituted the practice of law. *Cortez,* 692 S.W.2d at 50. Consequently, we hold that Brown's course of conduct does not fall within the activities authorized under article 21.07–4, section 1(b)(5) and (6) of the Texas Insurance Code. Brown's first six points of error are overruled.

Brown contends in his seventh point of error that the trial court erred in its findings, declarations, and issuance of a permanent injunction in that to do so constitutes

a denial of equal protection of the laws pursuant to the Fourteenth Amendment of the United States Constitution. Brown argues that he does no more, if not less, than claim adjusters and managers of insurance companies. Brown contends that to allow them to perform their acts but to deny him these same opportunities amounts to a denial of his right to equal protection of the laws. He emphasizes that the controlling element is the act and not the person who does the act; consequently, if claim adjusters may do these acts, he may do these acts. For authority, Brown relies upon *Liberty Mutual Insurance Co. v. Jones*, 344 Mo. 932, 130 S.W.2d 945 (1939) (in banc).

The Supreme Court of Missouri in *Liberty Mutual* stated that the laws of that state provide for claims adjusters, that the adjusters have to be licensed by the state, that the adjusters are subject to disciplinary legislation, and that adjusters are to perform their services under the advice and supervision of counsel. *Liberty Mutual Insurance Co. v. Jones*, 130 S.W.2d at 955, 961-62. Brown has not pointed to any legislation authorizing his conduct, he is not licensed by the State, he is not subject to disciplinary action, and he acts independent of the advice and supervision of counsel. This authority does not aid Brown's position.

■ Furthermore, we are not persuaded that Brown's acts and services are the same as adjusters' acts and services. " 'Adjuster' means any person who … investigates or adjusts losses on behalf of … any person who supervises the handling of claims." TEX.INS.CODE ANN. art. 21.07–4, § 1(a) (Vernon Supp.1987). Because Brown handles claims himself on behalf of persons *asserting* claims and because he does not investigate or adjust losses on behalf of someone who is *handling* claims, Brown does not meet the definition of an adjuster and is not, therefore, performing the same acts or services as an adjuster. Brown's seventh point of error is overruled.

Because all of the bases upon which Brown attacks the trial court's judgment have failed, we affirm the issuance of the permanent injunction.

The judgment of the trial court is affirmed.